# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**ANN PALMER,**

          Plaintiff,

vs.                                                     **No. CIV 00-1698 BB/LCS**

**LARRY G. MASSANARI,**[1] ,
**Acting Commissioner,**
**Social Security Administration,**

          Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER came before the Court upon Plaintiff's Motion to Reverse or Remand the Administrative Decision filed June 4, 2001 (*Doc. 9*). The Commissioner of Social Security issued a final decision denying the Plaintiff her claim for a period of disability and disability insurance benefits. The United States Magistrate Judge, having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, finds that the motion is not well taken and recommends that it be DENIED.

## PROPOSED FINDINGS

## I. PROCEDURAL RECORD

1.       Plaintiff Ann Palmer filed an application for a period of disability and/or all insurance benefits with the Social Security Administration on June 2, 1997 alleging a disability since October

---

[1]     Effective March 29, 2001, Larry G. Massanari was appointed to serve as Acting Commissioner of Social Security. Pursuant to FED. R. CIV. P. 25 (d), Larry G. Massanari, Acting Commissioner of Social Security, is substituted for William A. Halter, Acting Commissioner of Social Security, as the defendant in this action.

31, 1995 due to mental instability and depression. *See* R. at 106. Plaintiff's application was denied at the initial level on October 15, 1997, *see* R. at 75, and at the reconsideration level on January 15, 1998. *See* R. at 76. Plaintiff appealed the denial of her claim by filing a Request for Hearing by an Administrative Law Judge (ALJ) on January 16, 1998. *See* R. at 83.

2.     The Commissioner's ALJ conducted a hearing on Ms. Palmer's application on December 17, 1998. *See* R. at  40. The ALJ made the following conclusions according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993): the claimant had not engaged in substantial gainful activity since October, 1995; the severity of the claimant's impairments did not meet or equal a listed impairment; the claimant had "severe" impairments consisting of an adjustment disorder, a borderline personality disorder, depression, and back and neck pain; the claimant's subjective complaints and functional limitations, including pain was not supported by the evidence as a whole in the disabling degree alleged and therefore lacked credibility; and the claimant had a physical capacity for light work and the mental and emotional capabilities to perform semi-skilled work in a limited but still satisfactory manner. *See* R. at 17-31. Because of these findings, the ALJ finally concluded that Ms. Palmer was not disabled and that she had retained the residual functional capacity to perform the mental and physical requirements of other jobs available in the economy. *See* R. at 31.

3.     The ALJ entered his decision on March 26, 1999. *See* R. at 31. Thereafter, the Plaintiff filed a request for review in August of 1999 to the Appeals Council. *See* R. at 12. On October 6, 2000, the Appeals Council issued its decision denying her request for review and upholding the final decision of the ALJ. *See* R. at 8. The Plaintiff subsequently filed her complaint for court review of the ALJ's decision on November 30, 2000. (*Doc. 1*).

## II. STANDARD OF REVIEW

4.      The standard of review in this Social Security appeal is whether the Commissioner's

final decision is supported by substantial evidence and whether he applied correct legal standards.

*See Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion."

*Andrade v. Secretary of Health and Human Svcs.*, 985 F.2d 1045, 1047 (10th Cir. 1993) (quoting

*Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983) (citation omitted)).  A decision of an ALJ

is not supported by substantial evidence if other evidence on the record overwhelms the evidence

supporting the decision.  *See Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

5.      In order to qualify for disability insurance benefits, a claimant must establish a severe

physical or mental impairment expected to result in death or last for a continuous period of twelve

months, which prevents the claimant from engaging in substantial gainful activity. *See* 42 U.S.C.

§423(d)(1)(A); *see also Thompson*, 987 F.2d at 1486. The regulations of the Social Security

Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing

disability applications. *See* 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at

any step, the Commissioner finds the claimant is not disabled.  *See Thompson*, 987 F.2d at 1487.

6.      At the first four levels of the sequential evaluation process, the claimant must show

she is not engaged in substantial gainful employment, she has an impairment or combination of

impairments severe enough to limit her ability to do basic work activities, and her impairment meets

or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R.

Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§

404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the

3

Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *See id.*

### III. ADMINISTRATIVE RECORD

7.     Ms. Palmer starting seeing Gary L. Harmon, Psy.D. in June of 1996. *See* R. at 201. The Plaintiff complained of mood instability with depression, anger and transient suicidal ideation. *See* R. at 201. She told Dr. Harmon that there were numerous stresses contributing to her condition including financial difficulties, a recent hysterectomy, and behavior issues with her daughter. *Id.* The Plaintiff even described "experiencing herself in a fragmented way to the point of even having separate names for different aspects of her personality." *Id.* Her list of symptoms included depression, feelings of helplessness, sleep disturbance, and anger control. The doctor noted that there were no signs of cognitive deficits. *Id.* Dr. Harmon diagnosed the Plaintiff with "Adjustment Disorder with Depressed Mood," "Major Depression," and "Dissociative Disorder." *Id.* He recommended "individual psychotherapy on a weekly basis to work on coping with stress and problem solving." *Id.* Dr. Harmon wrote letters to Ms. Palmer's employers in June of 1996, November of 1996, and February of 1997 stating that she was unable to work due to her current condition. *See* R. at 199-200.

8.     In May of 1997, Dr. Harmon stated in a follow-up evaluation that "Ms. Palmer's condition has improved. Her depressive symptoms have subsided and she in better control of her anger. The dissociative episodes have also decreased in frequency. She remains on the antidepressant medication amitriptiline. Ms. Palmer has begun to learn better coping techniques for dealing with stress and frustration." *See* R. at 197. However, the doctor also stated that she experienced sudden mood swings and temporary states of helplessness when faced with unexpected problems and

stressors." *Id.* Dr. Harmon recommended that her individual psychotherapy be cut down to twice a month instead of twice a week.

9.      Although the last dated evaluation from Dr. Harmon is May, 1997, he prepared two assessments of the Plaintiff's ability to do work-related mental activities. These assessments are dated March 19, 1998 and November 2, 1998. *See* R. at 252 and 284. In the first statement, Dr. Harmon stated the Plaintiff was overwhelmed by unexpected stresses, was subject to episodic mood instability which would interfere with her ability to handle criticism, was somewhat rigid, and did not adapt well to change. *See* R. at 252 to 254. In each of the categories listed within the assessment, Dr. Harmon showed that the Plaintiff's limitations were "moderate/severe, but do not preclude employment." *Id.* Dr. Harmon completed another assessment on November 2, 1998 in which he made similar comments and conclusions. *See* R. at 284.

10.     In October of 1997, the Plaintiff saw Paul Hughson, M.D. *See* R. at 202. During the appointment, the Plaintiff commented on her emotionally instability and the fact that she had a "breakdown" in connection with a babysitting job that she had been doing for about four weeks. *Id.* However, she admitted to the doctor that "over the past three to four years, she has been able to provide part time services as a 'nanny' to two girls who live across the street with a single father and she feels she has been able to do this successfully in spite of her emotional ups-and-downs." *See* R. at 204-05. Dr. Hughson noted that Ms. Palmer appeared alert and articulate with an above-average intelligence. *See* R. at 207. In her final assessment, the doctor stated that Ms. Palmer "presents a somewhat complex diagnostic situation." However, "[f]rom a practical standpoint . . . she has responded very well to antidepressants, to psychotherapy, and to hormonal replacement; she remains fearful of reintegrating herself into the workforce. In our estimation, there is no reason why the

claimant should not go back to work except for her fear." *See* R. at 207-08. The doctor later diagnosed the Plaintiff with chronic adjustment disorder and borderline personality disorder. *See* R. at 208.

11.     On November 19, 1997, the Plaintiff was involved in a motor vehicle accident. *See* R. at 243. Her major complaints after the accident included neck, shoulder and back pain, headaches, and an aggravated rib injury. *Id*. She sought treatment from Dr. John Simons, a chiropractor. *See* R. at 242. Dr. Simons' initial assessment of the Plaintiff was that she had a cervical-thoracic lumbar strain and that he would treat her with conservative manipulations "two times a week until objective and subjective symptoms indicate reducing care." *Id.* The doctor's notes state that the patient was sore all over on November 24, 1997. *Id*. The following visits indicate similar notes, including, low back pain, headache, neck pain. *Id*. The Plaintiff was showing some signs of improvement until December 12, 1997, when she slipped on ice in her driveway and aggravated her condition. *See* R. at 241. A few days later, she stated to Dr. Simons that she was feeling better although a "little sore all over." *Id.* A few days after that, she canceled her appointment because she was feeling better. *Id*. The last note entered on December 29, 1997, states that the patient was experiencing pain in her upper thoracic region into the shoulders and that her lower back was stiff. *See* R. at 240. The results of Ms. Palmer's X-rays indicated "varying degrees of degenerative disc disease and spondylarthrosis at C 5-6 and 6-7 complicated by uncovertebral joint arthrosis at C5-6 which is resulting in neuroforaminal compromise." *Id*.

12.     Ms. Palmer subsequently sought an evaluation from her family practitioner, Dr. Patricia Carabajal. *See* R. at 249. On December 29, 1997, she told Dr. Carabajal that her back pain was better with medication, but that pain persisted in her left rib area. *See* R. at 248. The doctor

noted that there were "no other complaints or needs." *Id*. Dr. Carabajal noted that her past medical history included depression and peptic ulcer disease and reported finding no tenderness or spasm when she examined the claimant's back. *Id*. She advised the Plaintiff to continue use of a muscle-relaxant and referred her to an orthopedic specialists, Dr. Robert Wilson. *See* R. at 249.

13.     Dr. Wilson examined the Plaintiff on January 2, 1998. *See* R. at 259. He interpreted the x-rays taken by Dr. Simon as showing fairly advanced degenerative disc disease at the C 6-7 level and hyperlordosis of the lumbosacral spine, but said her disc spaces in that area were well preserved and there were no other significant changes. *Id*. The doctor diagnosed the Plaintiff with cervical degenerative disc disease with a superimposed cervical strain, along with mechanical low back pain with a superimposed strain. *See* R. at 260. He referred the Plaintiff to physical therapy in order to work on strengthening exercises. *Id*.

14.     A few months later, Dr. Carabajal saw Ms. Palmer at which she reported her back was doing much better from the water therapy treatment regimen. *See* R. at 245. However, she complained of recurring indigestion problems for which she had been taking antacid medication. *Id*. The doctor diagnosed the claimant with chronic indigestion and changed the Plaintiff's medication. *Id*.

15.     In April of 1998, Dr. Carabajal filled out both a physical and mental assessments of the claimant's abilities. *See* R. at 254-56. In the physical assessment,  Dr. Carabajal concluded that the Plaintiff could lift twenty pounds occasionally and less than ten pounds frequently; could stand/walk a total of two hours; and could sit less than six hours in a regular workday with limited abilities to push her lower extremities because of week lower muscles. *See* R. at 256. In Dr. Carabajal's mental assessment, she concluded that the Plaintiff's limitations were severe enough to

preclude any employment <u>but</u> her limitations, if any were minor. *See* R. at 255. In addition, Dr. Carabajal stated that Plaintiff's limitations were "moderate/severe, but do not preclude employment" with respect to her sustained concentration and persistence and were "severe enough to preclude any employment" with respect to her social interaction and adaptation. *Id*.

16.     On April 2, 1998, Ms. Palmer saw Dr. Hossein Mojtahed, a gastroenterologist, for an additional assessment of her epigastric symptoms. *See* R. at 264. The doctor noted that the Plaintiff complained of recurring episodes of upper abdominal pain with radiation to the back, and intermittent dysphagia and regurgitation. *Id*. Dr. Mojtahed's "impression" was that the Plaintiff presented complaints of severe gastroesophageal reflux symptoms, she responded somewhat to some treatments, but remained symptomatic particularly with dysphagia and intermittent regurgitation while on the medication. *Id*.   He also suggested that her present course of medication could be a contributing factor to her condition. *See* R. at 265. Dr. Mojtahed performed a procedure to evaluate the Plaintiff's upper gastro-intestinal track and to rule out esophagitis and peptic ulcers. *See* R. at 271. Dr. Mojtahed's impressions indicated marked gastroparesis and status gastritis. *See* R. at 272.

17.     Approximately three months later, Ms. Palmer was examined by Dr. Melquiades Olivares. *See* R. at 269. A progress note states that Ms. Palmer was visiting for a follow-up on her cough. *See* R. at 269. Ms. Palmer made no mention of her epigastric or back pain. *Id*. Dr. Olivares reported a normal abdominal and neurological examination. *Id*. One month later, Dr. Olivares stated that the she had improved but that she was depressed with some insomnia and referred to her past gastrointestinal problems as constipation and bladder problems. *See* R. at 267.

18.     Finally, the record includes some recent progress notes from Dr. Simon dated

January, 1998 to September, 1998. *See* R. at 280-83. In January of 1998, the Plaintiff reported neck pain, tightness in her lower back, and pain in her rib region. *See* R. at 283. On February 3, 1998, Ms. Palmer complained of sore muscles, but a couple of weeks later, stated she felt a lot better. *See* R. at 282. The very next week, the Plaintiff canceled her appointment because she felt good and she was in the middle of painting. *Id.* On February 25, 1998, Dr. Simon stated that "I feel the patient has reached her maximum medical improvement. She may have some residual symptoms over the next couple of months, however, I feel this will require a minimal amount of care." *Id.* Over the next few months, Ms. Palmer complained of back and rib pain. *See* R. at 281. However, the notes indicate that bronchitis has some contribution to her pain. *Id.*

19.     The following summary represents questions that were asked by the ALJ and the Plaintiff's attorney at Ms. Palmer's hearing on December 17, 1998. The Plaintiff testified that her difficulties and problems revolve around her psychological/emotional depression and anger issues. *See* R. at 45. With respect to her physical abilities, Ms. Palmer stated that as a result of her motor vehicle accident, she injured her back, neck, shoulder and clavicle. *See* R. at 60. She said that she is in pain all the time and that every day she wakes up in pain. *Id.* Ms. Palmer testified that her ability to stand is limited to a few minutes, then she must sit down and that she could only sit for a few minutes before changing positions. *Id.* Her ability to walk is limited to one block at a time. *Id.* Ms. Palmer also testified that she was employed as an administrative assistant but was fired due to her personal problems. *See* R. at 46. As of the date of the hearing, Ms. Palmer stated she was currently taking medication including Zoloft and Amitriptyline for her depression. *See* R. at 53. She stated she could function with the medication and that it keeps her calm and clear. *See* R. at 50 and 53. The Plaintiff  testified to taking herself to doctor's appointments, to doing some shopping when her

daughter is unavailable, and attending church. *See* R. at 57 and 62. In addition, she is the sole

provider of her seventeen year old daughter and is currently working towards a bachelor's degree.

*See* R. at 56 and 59.

20.     A vocational expert testified in order to assess Ms. Palmer's functional capacity. *See*

R. at 72. The ALJ asked the VE the following question:

> What impact on the – – either the availability of jobs (file clerk, duplicating machine
> operator, receptionist) or the transferability of those skills would a limitation of
> seriously limited, but not precluded in terms of ability to relate to co-workers, deal
> with the public or interact with supervisors have? *See* R. at 71.

The VE responded by stating that "[s]eriously limiting in those jobs, she would --there aren't any of

those jobs that she could perform because they're all dealing with the public, supervisors, and co-

workers. *Id*. The ALJ further explored the possibilities by asking the VE the following:

> What impact do you have if you take those factors I've just outlined, seriously limited,
> but not precluded in terms of ability to deal with co-workers, relate to public, interact
> with supervisors. Throw into the mix the seriously limited but not precluded in terms
> of ability to behave in an emotionally stable manner, relate predictably in social
> situations and deal with work stresses? What impact does that have on the availability
> of jobs? *See* R. at 72.

The VE answered "that would eliminate all jobs." The Plaintiff's attorney was then given the

opportunity to asked the VE questions. The only question he posed was the following:

> I want you to assume . . . in a work setting . . . that she would have problems in
> completing a normal work day, accepting instructions and responding appropriately
> to criticism, getting long with co-workers and peers without distracting them or
> exhibiting behavioral extremes and responding appropriately to changes in the work
> setting. Making those assumptions, would the claimant be able to do any her past
> relevant work or any of the suggested jobs you've come up with? *See* R. at 73.

The VE stated that there were no jobs he could come up with. *See* R. at 73.

10

### III. DISCUSSION

21.     Plaintiff raises seven arguments in support of her Motion to Reverse or Remand the Administrative Agency Decision. First, the Plaintiff argues the ALJ failed to give controlling weight to Plaintiff's treating doctors, Gary L. Harmon, Psy.D. and Patricia A. Carabajal, M.D. Second, the ALJ failed to assess the Plaintiff's severe mental impairments with the accompanying functional limitations. Third, the ALJ erred by failing to do an analysis of the Plaintiff's pain condition. Fourth, the ALJ failed to properly determine the Plaintiff's residual functional capacity. Fifth, the ALJ erred in failing to consider the Plaintiff's impairments in combination. Sixth, the vocational findings are incomplete, inaccurate and not reflective of the complete VE testimony. And lastly, the ALJ erred in his credibility assessment.

### Plaintiff's Treating Doctors

22.     The Plaintiff first argues that the ALJ failed to give reasons why he did not give controlling weight to the Plaintiff's treating doctors, Gary L. Harmon, Psy. D. and Patricia A. Carabajal, M.D.

23.     When disregarding the opinion of a treating physician, the ALJ must give specific, legitimate reasons and must consider the following specific factors to determine what weight to give any medical opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors

brought to the ALJ's attention which tend to support or contradict the opinion. *See Goatcher v. United States Dep't of Health & Human Servs.*, 52 F. 3d 288, 290 (10th Cir. 1995).

24.     "A treating physician may offer an opinion which reflects a judgment about the nature and severity of the claimant's impairments including the claimant's symptoms, diagnosis and prognosis, and any physical or mental restrictions." *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir.1994); 20 C.F.R. 404.1527(a)(2), 416.927(a)(2). "The Secretary must give substantial weight to the evidence and opinion of the claimant's treating physician, unless good cause is shown for rejecting it. If an ALJ rejects the opinion of a treating physician, he or she must articulate specific, legitimate reasons for doing so." *Washington v. Shalala*, 37 F.3d 1437, 1440 (10th Cir.1994) (citation and quotations omitted); *see also* 20 C.F.R. 404.1527(d)(2); 416.927(d)(2).

25.     In this case, the Plaintiff argues the ALJ failed to give controlling weight to Dr. Harmon's and Dr. Carabajal's assessments. First, with respect to Dr. Harmon's opinion, the ALJ specifically considered the doctor's opinions of June, 1996 and May, 1997, but did not confer full weight to his opinion that she was incapable of working for a certain period of time. *See* R. at 24. The ALJ concluded that Dr. Harmon's assessment was not clear from the evidence in the record. He pointed to the fact that Dr. Harmon "provided no formal or detailed mental status evaluation, nor did he submit any of his clinical treatment notes to support his opinion. He consistently described the claimant as improving with medication and psychotherapy, and he identified a return to work as one of his objectives." *Id.* In addition, the ALJ points to Dr. Harmon's completed assessment of the claimant's ability to do work-related activities. Dr. Harmon concluded that the claimant's limitations were moderate/severe but did not preclude employment. *See* R. at 25. Not only do I find that the ALJ

appropriately considered Dr. Harmon's assessments, but that also he was proper in discrediting the doctor's assessment about the Plaintiff's ability to work.

26. With respect to Dr. Carabajal's assessments, the ALJ stated the following:

> I find no basis either in her clinical notes or her treatment relationship to accord any significant weight to Dr. Carabajal's inconsistent opinions in regard to the claimant's mental abilities. I give much greater weight to the opinions and conclusions of Drs. Harmon and Hughson, both of whom are mental health professionals and both of whom essentially found the claimant capable of working. *See* R. at 26.

27. Once again, I find this determination is supported by substantial evidence. The ALJ relied on at least two reasons for disregarding Dr. Carabajal's mental assessment. First, the ALJ compared Dr. Carabajal's assessment to other treating psychologists and found it to be inconsistent. Second, the ALJ disregarded Dr. Carabajal's mental assessment due to the fact that she is a family practitioner not a mental health professional. The ALJ further reasoned that since there were more qualified opinions present within the record, his decision would rely more heavily on their assessments and not Dr. Carabajal's.[2] Where the record provides mental assessments by family practitioners in addition to assessments by psychologists, the specialists' opinions are accorded more weight. *See Goatcher v. Dep't of Health & Hum. Serv.*, 52 F. 3d 288, 289 (10th Cir. 1995); *see also* 20 C. F. R. §§ 404.1529(d)(5) & 416.927(d)(5)(1995). Furthermore, Dr. Carabajal's assessment seems to be inconsistent itself. Within the assessment the doctor concludes the Plaintiff's limitations are severe enough to preclude any employment and that the Plaintiff's limitations, if any, are minor. *See* R. at 255. Therefore, I find that not only did the ALJ articulate specific, legitimate reasons for disregarding Dr. Carabajal's mental assessments, *see Washington*, 37 F.3d at 1440, he was correct in doing so.

---

[2] The ALJ relied on the opinions of two treating psychologists, Dr. Harmon and Dr. Hughson, who both concluded that the Plaintiff's condition did not preclude her from working. *See* R. at 26.

13

## Severity of Plaintiff's Impairments

28.     The Plaintiff argues that the ALJ failed to assess the Plaintiff's severe mental impairments as required by SSR 96-3p. A step two determination that an individual's impairment is not severe requires a careful evaluation of objective medical evidence and related symptoms, as well as an assessment of the functionally limiting effects of the impairment. *See* SSR-96-3p. However, in this case, the ALJ determined that Ms. Palmer "has had 'severe' impairments, consisting of an adjustment disorder, a borderline personality disorder, and depression." *See* R. at 18. Therefore, since the ALJ determined that the Plaintiff's disorders are considered severe, I find the Plaintiff's argument that he failed to properly assess her mental impairments under SSR 96-3 is unpersuasive.

## ALJ's Assessment of the Plaintiff's Pain Condition

29.     Plaintiff contends that the ALJ failed to perform the proper analysis of the Plaintiff's pain condition. In conjunction with this argument, Ms. Palmer contends that the ALJ's credibility determination is also flawed. The ALJ found that "Ms. Palmer has symptom-producing medical problems, but . . . . her testimony and other evidence do not credibly establish symptoms or functional limitations to the extent alleged." *See* R. at 18. According to the record and the Plaintiff's testimony, there are two documented sources of pain: epigastric discomfort and back problems. *See* R. at 60 and 154.

30.     With respect to the Plaintiff's epigastric discomfort, the ALJ predicated the claimant's pain credibility assessment on the following factors:

> She complained numerous times in the record of major abdominal impairment. The only treatment physicians have recommended for these symptoms is antacid medication. In July 1998 the claimant made no mention of stomach distress, and at the time of her last documented physical examination in August 1998, Dr. Olivares

14

described her gastrointestinal problems as nothing more than constipation. *See* R. at 28-29.

The ALJ further assessed the Plaintiff's back problems and discredited her declaration of pain. He grounded his conclusion on the Plaintiff's progress in physical therapy and her statements to her treating physicians.

> The claimant responded well to physical therapy and chiropractic treatments. . . . she told Dr. Simon in February 1998 that therapy had really helped her back, and she reported to Dr. Carabajal in March 1998 that her back was doing much better. On February 23, 1998, she canceled an appointment with Dr. Simon because she was in the middle of painting. At the time of her last physical examination in August 1998, she offered no complaints of back pain and Dr. Olivares reported a normal neurological examination. *See* R. at 29.

31.     If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Secretary's decision stands and Plaintiff is not entitled to relief. *See e.g., Hamilton v. Secretary of Health & Human Servs*., 961 F. 2d 1495, 1497-1500 (10th Cir. 1992). I find that the ALJ supported the Plaintiff's pain determination with substantial evidence. There is nothing in the record to contradict the evidence relied upon in the ALJ's opinion. In addition to the ALJ's pain determination being supported with substantial evidence, the ALJ's credibility determination with respect to the Plaintiff's complaint of pain was also properly made. While it is true that this Court generally defers to credibility determinations of the ALJ, such deference is not absolute. *See Thompson v. Sullivan*, 987 F. 2d 1482, 1490 (10th Cir. 1993). In evaluating a claim of disabling pain, the appropriate analysis considers (1) whether there is objective medical evidence of a pain producing impairment, (2) whether there is a loose nexus between this objective evidence and the pain, and (3) whether, in light of all the evidence, both objective and subjective, the pain is in fact disabling. *See*

*Glass v. Shalala*, 43 F. 3d 1392, 1395 (10th Cir. 1994) (citing *Luna v. Bowen*, 834 F. 2d 161, 163 (10th Cir. 1987)).

32.     The ALJ properly applied these factors in this case. For instance, the ALJ referred to multiple situations in which the Plaintiff notified her physicians of her physical improvement. Specifically, the ALJ pointed to a February, 1998 examination where Ms. Palmer told Dr. Simon that she was going to physical therapy and that this regimen had helped her to feel a lot better. *See* R. at 282. She even canceled her next appointment because "she was in the middle of painting and was feeling pretty good." *Id*. Dr. Simon concluded the Plaintiff "to be at maximum medical improvement and would require no more than a minimal amount of care over the next couple of months." *Id*. There is nothing in the record, <u>to date</u>, that contradicts these conclusions. Although there are multiple assessments made in earlier years which are indicative of the Plaintiff's back pain, these assessments immediately followed major surgeries or the Plaintiff's motor vehicle accident.

33.     The Plaintiff also stated to Dr. Olivares in July of 1998 that she felt her condition was improving. *See* R. at 267 and 269. She made no mention of back or epigastric pain. *See* R. at 269. The next month, Dr. Olivares stated that Ms. Palmer was doing well on her current medication regimen. *See* R. at 267.  The Plaintiff even testified that she felt she can function as long as she takes her medication. *See* R. at 50. Moreover, the record indicates that the Plaintiff has successfully engaged in part-time child care in spite of her alleged emotional and functional limitations, that she is currently trying to complete her bachelor's degree and that she is the sole care provider of her seventeen year old daughter. *See* R. at 15,18, and 204. A review of the record establishes that the ALJ's findings are accurate and entirely consistent with the record. The ALJ applied the correct legal

and standards and substantial evidence supports his determination that Plaintiff's complaints of disabling pain lacked credibility.

### The ALJ's Residual Functional Capacity Assessment

34.     The Plaintiff next argues that the ALJ failed to properly determine her residual functional capacity (RFC) pursuant to SSR 96-8p. The ALJ found the Plaintiff had the exertional capacity to perform work at a light exertional level, with a limited but still satisfactory mental capability for semi-skilled work involving skills similar to what she utilized in the past. *See* R. at 29.

35.     Plaintiff argues that the ALJ did not make a proper RFC assessment because the decision did not express the Plaintiff's capacity on a function-by-function basis and that he did not properly support his RFC determination with substantial evidence. These arguments are not persuasive.

36     After a claimant has established at step four that he or she cannot return to his past relevant work, the burden shifts to the Commissioner to show that the claimant retains the residual functional capacity (RFC) to do other work that exists in the economy. *See Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10th Cir.1991).[3] Residual functional capacity is defined by the regulations as "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a); *see also Davidson v. Sec'y of HHS*, 912 F.2d 1246, 1253 (10th Cir.1990). The ALJ's decision that a claimant retains the RFC to do other work must be based on substantial evidence as are most ALJ

---

[3]     In order to assist the ALJ in determining the claimant's ability to perform other work, a vocational expert was called to testify. The VE stated that nearly all of the claimant's previous work was skilled in nature and ranged from sedentary to light in exertional requirements. *See* R. at 71. The ALJ then conceded that Ms. Palmer would probably not be able to perform her previous jobs because her functional capacity of no more than semi-skilled work would preclude it. *See* R. at 30.

determinations. *See Gossett*, 862 F.2d at 804. In determining a claimant's limitations, the ALJ should "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The ALJ must also consider "all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC. Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence." SSR 96-7p. Furthermore, in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. SSR-95-5p.

    37.    Here, the ALJ did make detailed findings required by the regulations and rulings. In addition to arriving at an RFC, agency rulings require that an ALJ must provide a "narrative discussion describing how the evidence supports" his or her conclusion. See SSR 96-8p. The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis ... and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* The ALJ "must also explain how any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." *Id.* The RFC assessment "must not be expressed initially in terms of the exertional categories of "sedentary [or] light;" rather, a function-by-function evaluation is necessary

in order to arrive at an accurate RFC. *Id.* ("[A] failure to first make a function-by-function assessment of the [claimant's] limitations of restrictions could result in the adjudicator overlooking some of [the claimant's] limitations or restrictions.").

38.     Although, the ALJ made a conclusory determination that "the medical evidence supports a capability to perform at least light work-level work activity," it is predicated by fourteen pages of findings and analysis. *See* R. at 29. The ALJ specified that he relied on evidence in the record to support his conclusion in direct compliance of the agency's regulations and rulings. See SSR 96-8p. In evaluating the claimant's RFC, the ALJ relied on the Plaintiff's treating physician, Dr. Harmon's mental RFC determination, that her limitations were moderate/severe but did not preclude employment. *See* R. at 25. In addition, the ALJ referred to Drs. Carabajal's and Simons' evaluations in 1998 reporting that the Plaintiff was doing much better physically. *See* R. at 29. The ALJ further stated that

> 20 CFR 404.1567 and 416.967 define light work as lifting and carrying a maximum of 20 pounds occasionally and 10 pounds more frequently. Light work requires primarily standing and walking, or sitting with some pushing and pulling of arm and leg controls. This finding that the claimant can perform at least light-level work is consistent with the medical record, which documents no major physical impairments or limitations, with the claimant's somewhat sporadic and relatively minimal treatment regimen, and with her actual level of activities. In addition, I find that the claimant retains the capability to perform routine, semi-skilled work, with no more than moderate limitations in any area of mental, social or occupational functioning. *See* R. at 30.

39.     After reading the opinion and the record, I find the ALJ analysis of the Plaintiff's RFC determination was consistent with the regulations and that it was supported by substantial evidence.[4] SSR 96-8 states that an "RFC is an administrative assessment of the extent to which an

---

[4]     Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, requires a good deal of walking, standing, or pushing and pulling

individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." The ALJ must demonstrate that he considered all of the evidence in the record, but he is not required to discuss every piece of evidence. *See Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (citing *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)). Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects. *See Id.* (citing *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984)).

40.     In this case, the ALJ documented the Plaintiff's entire medical history within his opinion. Not only did the ALJ refer to uncontroverted evidence which would support a finding of disability, he stated reasons why he discredited such evidence. For example, the ALJ noted that Ms. Palmer was diagnosed with degenerative disc disease. *See* R. at 29. However, he further found that the Plaintiff responded well to physical therapy and chiropractic treatments. *Id*. After review of the record, I find that the ALJ performed the proper analysis and his findings are supported with substantial evidence in the record.

## **Combination of Impairments**

41.     Plaintiff next alleges that the Commissioner's decision is not based upon substantial evidence because the ALJ failed to correctly evaluate all of Plaintiff's mental impairments in combination with the effects of her pain. A claimant's mental impairment must be evaluated in

---

when sitting is involved. SSR 83-10; 20 C. F. R. § 404.1567(b), 416.967(a) (1986).

combination with the effects of other impairments, including physical impairments and any nonexertional limitations. *See Hargis v. Sullivan*, 945 F. 2d 1482, 1491 (10th Cir. 1991).

42.     Reviewing the record and the ALJ's findings, I find that the ALJ did consider the Plaintiff's mental impairments both alone and in combination with her physical impairments. However, because the ALJ properly discredited the Plaintiff's complaints of pain, he did not find a medically severe combination of impairments. He was therefore not obligated  to consider the combination throughout the process.  *See* 20 C.F.R. § 416.923.

### Vocational Expert

43.     The Plaintiff's final argument asserts that the ALJ's vocational findings are incomplete, inaccurate and not reflective of the complete VE testimony. Specifically, the Plaintiff argues that the ALJ cannot select limited comments made by the VE and ignore unfavorable answers. As outlined above in the Administrative Record section of this opinion, the ALJ asked certain questions to the VE. One of the answers given by the VE was that there were no jobs available when one takes into consideration a person who's emotional stability is seriously limited but not precluded in terms of ability to deal with co-workers, relate to public, and interact with supervisors. *See* R. at 71.

44.     A hypothetical question to the vocational expert must relate all of a claimant's impairments with precision. *See Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir.1991). An ALJ may not ask a vocational expert a hypothetical question based on substantial evidence and then ignore unfavorable answers. *See Campbell v. Bowen*, 822 F.2d 1518, 1523 n.6 (10th Cir. 1987). An ALJ posing a hypothetical question to a vocational expert is not required to include all of a social security disability claimant's limitations, but only those which he or she finds credible. *See Jordan v. Heckler*,

835 F.2d 1314, 1317 (10th Cir.1987) (ALJ's failure to include complaints of pain in hypothetical was not inappropriate as there was not sufficient evidence that pain interfered with claimant's ability to work). In this case, the ALJ found the Plaintiff's testimony and other evidence did not credibly establish symptoms or functional limitations to the extent alleged. *See* R. at 18. His hypothetical question assumed that Plaintiff was seriously limited in the ability to relate to co-workers, deal with the public, and interact with supervisors. The ALJ's reliance on the testimony of the vocational expert as to claimant's ability to work, considering the impairments which were underlined substantiated, was not error. *See Campbell v. Bowen*, 822 F.2d 1518, 1523 n.6 (10th Cir. 1987) (An ALJ may not ask a vocational expert a hypothetical question based on substantial evidence and then ignore unfavorable answers.) Although the VE furnished an unfavorable answer, the ALJ's question was not supported by the record. Therefore, even though the ALJ included within his questions pertaining to an individual with seriously limiting emotional problems at the hearing, he was not required to rely upon the VE's answer if he later discredited the Plaintiff's alleged limitations. I cannot say the Secretary's decision is unsupported by substantial evidence. *See Evans v. Chater*, 55 F.3d 530, 532 (10th Cir.1995) (noting "established rule that such inquiries must include all (and only) those impairments borne out by the evidentiary record").

## RECOMMENDED  DISPOSITION

The ALJ did apply correct legal standards and his decision is supported by substantial evidence. I recommend that the Plaintiff's Motion to Reverse and Remand Administrative Decision, filed June 4, 2001, should be **DENIED**. Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C).  Within ten days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to §636(b)(1)(C),  file written objections to

such proposed findings and recommendations with the Clerk of the United States District Court, 333 Lomas Blvd. NW, Albuquerque, NM 87102.  A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**